# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7559 | **DATE** | 4/27/2000 |
| **CASE TITLE** | Maytag Corp. vs. Whirlpool Corp. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. This completes the construction of the debated claims in Whirlpool's patents as a matter of law. With this Court's earlier opinion having done the same as to Maytag's patents in issue, the case is ready for the second phase of a patent case: a jury determination on the issues of infringement and invalidity. This action is set for a status hearing at 9 a.m. May 5, 2000 to discuss the necessary procedures and timing to that end.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | APR 28 2000 | | |
| | Notified counsel by telephone. | | date docketed | | 68 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | 4/27/2000 | | |
| SN | courtroom deputy's initials | | date mailed notice | | |
| | | | SN | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAYTAG CORPORATION,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    No.  97 C 7559
                                   )
WHIRLPOOL CORPORATION,             )
                                   )
            Defendant.             )

<u>MEMORANDUM OPINION AND ORDER</u>

This <u>Markman</u> ruling[1] addresses the Counterclaim by Whirlpool

Corporation ("Whirlpool") charging patent infringement by Maytag

Corporation ("Maytag").[2]  That Counterclaim involves a variety of

claim elements in United States Patents Nos. 5,165,433 and

5,803,100[3] relating to dishwasher pump and soil separator

---

[1]  Under <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S.
370, 384 (1996) this Court is required to construe the scope and
meaning of a patent's claims as a matter of law before the
factual application of those claims to the accused product.

[2]  This Court's March 14, 2000 (the "Opinion," 2000 WL
288101) has similarly construed relevant patent claims in
Maytag's Complaint against Whirlpool.

[3]  This opinion will refer to the patents in suit as the
"'433 Patent" and the "'100 Patent."  As for the applicable
statutory law, all citations to paragraphs of 35 U.S.C. §112 will
simply take the form "Paragraph --."  Maytag's and Whirlpool's
initial memoranda will be cited as "M. Mem. --" and "W. Mem. --,"
with Whirlpool's reply referred to as "W. R. Mem. --."  Citations
to other submissions will also use the "M." and "W." designa-
tions.

systems.[4]  Before the claims can be construed, it is necessary

(1) to review the relevant technology briefly, (2) to discuss one

key principle of claim construction and (3) to dispose of a minor

dispute between the parties.

## Dishwasher Pump Technology

On March 3, 2000 Whirlpool and Maytag put on highly

informative graphic presentations for this Court's benefit on the

technology involved in the '433 Patent and the '100 Patent.  What

follows is a somewhat simplified summary of what those

presentations revealed.  And of course no references here to what

the successive patents have disclosed should be misinterpreted as

expressing this Court's views as to whether those disclosures

constituted patentable advances or as to whether, if so, Maytag

has infringed them.

Dishwasher pump and soil separator systems dispense and

recirculate hot and soapy water throughout the washing chamber

while extracting soil that has been removed from the dirty

dishware.  Various methods have developed in the art for removing

soil particles from the water.

One earlier Whirlpool patent (United States Patent No.

---

[4]  Whirlpool earlier withdrew claims of infringement of its
United States Patent No. 4,319,599 (the "'599 Patent").

3,335,867) placed a "full flow filter" in the sump at the bottom of the wash chamber to prevent large soil particles from being recirculated in the wash. But that system was not effective for filtering out smaller particles. Then an improvement, as shown in the '599 Patent, attached a soil collector to the pump. That system moved water from the sump up into the pump and then used centrifugal force so that "soil particles are forced to the outer periphery of the pump chamber," where it was directed into the soil container by a guide chamber (W. Mem. 5). Because the flow of water and soil into the soil container was relatively slow, particles were filtered by allowing them to settle on the bottom of the container. That system, however, still did not remove smaller particles that did not settle, and the slow rate of water limited the amount of water that was filtered.

Next a more effective means of soil collection was introduced by the '433 Patent: It, while similar to the '599 Patent, added a fine mesh filter to the top of the soil container to capture smaller particles. Water and soil thus flowed from the sump into the centrifugal pump chamber and into the soil container via the guide chamber. In the soil container, particles heavier than water settled on the bottom and lighter particles were captured by the filter at the top, leaving

3

filtered water to flow back down into the sump. That design also allowed for eight times the water flow into the soil container than was allowed by the design disclosed by the '599 Patent.

Finally for present purposes, the '100 Patent disclosed a further modification that altered the shape of the soil container. To reduce the volume of water that the soil container held during the wash period, the soil container was made more shallow except for a "sump area" to collect the heavier particles.

## Claim Construction

While this opinion will avoid useless repetition on the law as discussed in the Opinion, a brief discussion of one key topic is needed. Citing <u>Toro Co. v. White Consol. Indus.</u>, 199 F.3d 1295 (Fed. Cir. 1999) and <u>Wang Labs. Inc. v. America Online, Inc.</u>, 197 F.3d 1377 (Fed. Cir. 1999), M. Mem. 1 incorrectly urges that "as a matter of law, claims cannot be construed to be broader than what is contained in the specification." Though to be sure those cases are important recent developments in the <u>Markman</u> analysis, they do not paint with as broad a brush as Maytag would have this Court believe.[5] Instead they stand for

---

[5] Indeed, Maytag itself earlier took the less extreme (and more accurate) stance, at page 6 of its memorandum in connection

4

the quite different proposition that claim elements should not be broadened "beyond their meaning in light of the specification" (Toro, 199 F.3d at 1302, emphasis added).[6]

It remains axiomatic that claim language can be broader in scope than any limitations set forth in the specification. Even more recently Kemco Sales, Inc. v. Control Papers Co., 2000 WL 354768, at *7 (Fed. Cir. April 7), quoting Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994), noted "the danger of reading limitations into the claims from the preferred embodiments":

> [A]lthough the specifications [sic] may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.

One key factor in the overall analysis is whether the dictionary definition of the claim language is "in sufficient detail to resolve close questions in particular contexts" (Toro, 199 F.3d

---

with the Markman proceeding involving its claims against Whirlpool, that "[t]he general rule is that terms in a claim are to be given their ordinary meaning unless it appears that the inventor used them otherwise."

[6] If claims were always defined solely by the specification, the limitations imposed by Paragraph 6 would be of general rather than specific applicability.

at 1300).[7] Another highly relevant factor may be whether the specification offers only a single embodiment of the invention (id. at 1301; Wang, 197 F.3d at 1383). But Wang, id. relatedly observes:

> Whether an invention is fairly claimed more broadly than the "preferred embodiment" in the specification is a question specific to the content of the specification, the context in which the embodiment is described, the prosecution history, and if appropriate the prior art, for claims should be construed, when feasible, to sustain their validity.

### Motion To Strike Expert Testimony

Whirlpool cries "foul" at Maytag's inclusion in its briefing materials of an "Expert Report of Henry Stoll" (the "Stoll Report"). That report expresses Stoll's "opinions as to the teachings and claims of" the patents in suit (Stoll Report at 1). But while Maytag's brief is replete with references to the Stoll Report, this opinion has ignored those references as unnecessary

---

[7]  Toro, 199 F.3d at 1300 went beyond the claim language in part because "[t]he dictionary definitions of [the claim language] do[es] not shed dispositive light" on the meaning of the claim language in the context of the patent. See also Anderson v. International Eng'g & Mfg., Inc., 160 F.3d 1345, 1348-49 (Fed.Cir. 1998):

  [D]ictionary definitions of ordinary words are rarely dispositive of their meaning in a technological context. A word describing patented technology takes its definition from the context in which it was used by the inventor.

to the construction of the relevant claims.  Hence there is no

need for any substantive discussion on the propriety of

submitting the Stoll Report.

<u>Disputed Claim Elements in the '433 Patent</u>

<u>"Second Wall" in Claim 1</u>

Claim 1 includes this element (emphasis added to identify

the terms disputed by the parties):

>     a <u>second wall</u> disposed <u>outwardly</u> of said first
>     upstanding annular wall and defining therebetween a
>     <u>guide chamber</u>.

That language must be read in light of the specification's

representation (1) of the first wall as serving as both the outer

wall of the pump chamber and the inner wall of the guide chamber

and (2) of the second wall as the outer wall of the guide chamber

and inner wall of the soil container.  W. Mem. 13-14 asserts that

because the specification uses the term "wall" in an array of

ways, this Court should construe "second wall" broadly as "a

structure for holding back pressure that may be of any shape,

size, orientation or formed of any number of individual parts"

(<u>id</u>. at 14).[8]  But such wishful thinking runs contrary to the

_____

   [8]  W. Mem. 13 alternatively contends that a "'wall' is a
structure that serves to hold back pressure" and that because
that "meaning...is plain upon a simple reading of the claim...no
further inquiry into the specification is necessary."  But in the

7

words of the claim because to form a guide chamber "therebetween," the outwardly disposed second wall must be "upstanding"[9] and must surround the annular first wall.

W. R. Mem. 11 (footnotes omitted) attempts to avoid such a construction:

> [T]he inventor has testified that the '433 invention could readily be implemented using a non-annular guide chamber. One of the inventor's first prototypes... [used] a "hole" directly from the pump chamber to the soil container chamber. In the inventor's mind, the guide chamber of the '433 invention is merely a "conduit, "pipe" or "path."

Not only is that testimony unacceptable as extrinsic evidence, but it is also impermissible revisionist history that directly contravenes the words of the claim. Whirlpool drafted that claim language, and it is Whirlpool's fault if it did not properly reflect what was supposedly in the "inventor's mind."

---

present context the term "wall" has no definitive content without reference to the specification.

[9] That does not however mean that the second wall must be a straight vertical wall as viewed from the side. As the ensuing discussion highlights, it must simply be "upstanding" to the extent that its radially outward placement from the first wall forms a guide chamber "therebetween." As used in this opinion, "radially outward" connotes a structure on the same horizontal plane--that is, sharing space along a vertical axis--but farther away from the center of the pump chamber.

As for the shape of that second wall,[10] the specification embodies only an annular wall that encircles the first concededly annular wall. W. Mem. 15 nonetheless argues that the omission of the term "annular" in the claim language as to the second wall, while that term is expressly used as to the first wall, marks "a clear intent" to avoid that limitation. It is also true that construing the second wall in claim 1 as necessarily annular makes that claim nearly identical to claim 2 (W. Mem. 15).[11] Because that argument has some logical force (though any nonannular alternative would surely seem to be a less likely candidate[12]), this Court holds that the second wall does not have to be "annular." Instead it may be square, or in the shape of a pentagon, or in any other shape that fulfills the in-all-events requirements that it must be upstanding and must completely surround the first upstanding annular wall.

---

[10]  "Shape" as used in this opinion refers to how the second wall appears from an overhead view.

[11]  Claim 2 states in relevant part: "said second wall comprises an annular wall disposed substantially circumjacent said first annular wall."

[12]  Given fluid dynamics and the forces of friction, it is obvious that the optimum shape for an upstanding wall that surrounds an upstanding annular wall to guide fluid therebetween is also annular.

In still another effort to reshape the English language, W. Mem. 14 would like to define "outwardly" as "away from a center point in any direction." To the contrary, M. Mem. 15 is right in saying that the term "'outwardly' must mean, by definition, radially outward and sharing at least some position along a vertical axis." Hence the second wall is positioned circumjacently to the first annular wall. Buttressing that normal meaning of the claim language, the specification describes how centrifugal force is central to the design by forcing water over the first wall and into the guide chamber[13]–and to position the second wall in any direction other than radially outward would negate that effect. Moreover, the specification says "outwardly and upwardly" to describe the flow of wash liquid in the soil collection chamber (col. 2, l. 38)--a usage that torpedoes Whirlpool's current suggestion that "up" is the same as "out."

It is useful to sum up the end result of the analysis of ordinary English language usage--and not of Whirlpool's attempted convolutions--to this point. As used in claim 1, a "guide

---

[13] Except where otherwise indicated, this opinion's column and line references are to the patent whose claims are being construed. Here col. 6, l. 40 says that "the "wash liquid [in the pump chamber] contains a heavy concentration of entrained soil particles...which tend to be forced outwardly by centrifugal force."

chamber" is a space formed between the second upstanding wall and the first annular upstanding wall that it surrounds, with that second wall being located radially outward from that first wall.[14]

To round out the analysis (perhaps a bad pun), this opinion should eliminate any potential misunderstanding of two other terms--"annular" and "subjacent"[15]--that are relevant to the claim element under consideration and that this opinion has already used, but without formal definition. W. Mem. 19-20 suggests that "annular" means "at least part of a circle, but not necessarily a full circle," and that "circumjacent" means "lying adjacent to at least a portion of an object, generally in a curved manner, but again, not restricted to a full 360° surrounding." Again those purported definitions are seriously warped--not only are they contrary to the terms' dictionary meanings, but nothing in the '433 Patent suggests any usage different from those dictionary meanings.

---

[14] Both parties agree that "guide chamber," as the term implies, is a compartmented space (see W. Mem. 14, M. Mem. 15).

[15] Maytag and Whirlpool directly dispute the meaning of those terms in the context of claims 2 and 4 in the '433 Patent. Because this opinion addresses those terms at this point, no later discussion as to those other claim elements is needed.

11

"Annular" means, in the words of the first listed definition

in Webster's Third New International Dictionary (unabridged

1986)("Webster's") "of or relating to a ring:  forming a ring:

shaped like a ring."[16]  To escape that really tautological usage,

W. Mem. 19 points to a reference in the '599 Patent to the

"annular flow" of water and to soil "flow that follows an

approximately 270° path within the soil container."  But an

"annular flow" merely describes the circular (ringlike)

orientation of the liquid's flow.  Although a patentee may choose

to use the same word in different ways in different patents (part

of the conventional wisdom that a patentee may be his or her own

lexicographer), it is worth noting that the '100 Patent used the

term "substantially annular" to describe a structure that was

greater than 270° in circumference but was not completely

enclosed ('100 Patent, col. 6, l. 25)--something that surely

renders it more likely that the closely related '433 Patent

employs "annular" to mean a full 360° ring.[17]

As for "circumjacent," Whirlpool offers nothing persuasive

---

[16]  That is scarcely surprising, given the word's derivation
from the Latin "annulus"--a ring.

[17]  And of course the specifications in both the '433 Patent
and the '100 Patent use the term "annular" to describe a complete
ring.

to suggest that the term is understood in the art as indicating a location in relation to only "at least a portion" of another object (W. R. Mem. 17).[18]  Hence the term is given its ordinary _Webster's_ listed meaning of "lying adjacent <u>on all sides</u>: surrounding" (emphasis added).[19]

<u>"Second Wall...Including an Aperture" in Claim 1</u>

Claim 1 also states that the second wall:

> includ[es] an aperture permitting said soil-laden portion of the wash liquid to flow from said guide chamber.

M. Mem. 18 (emphasis in original) seeks a ruling that the quoted language "requires an aperture, or opening, <u>in</u> the second wall." Whirlpool does not debate that construction, which comports with the plain meaning of the claim language.

---

[18]  W. R. Mem. 17 n.22 cites a single patent "relating to a dishwasher construction" that uses "circumjacent" in a context where a structure does not completely surround another structure. Despite the already-referred-to notion that any patentee (in this instance, someone else) may serve as his or her own lexicographer, potentially giving a myriad of meanings to the same term in different patents, Whirlpool's <u>own</u> patent plainly uses the term in its ordinary sense to describe a structure that completely surrounds another.

[19]  Once again a language buff hardly requires schooling in classical Latin to couple "circum" with "jacent" (the latter as in "adjacent").

Another element included in claim 1 is:

a third wall defining a soil container, said soil
container being fluidly connected to said guide chamber
by said aperture in said second wall.

Here M. Mem. 18 asks only that the "third wall" be construed as
"a wall" and not as the "'cover' or top of the soil container."
Because "wall" in the quoted context is not dispositively self-
defining, it becomes appropriate to refer to the specification.

On that score Whirlpool says (W. Mem. 16):

The specification identifies the soil container chamber
54 as being defined by the lower housing wall 49 (the
bottom), the soil container wall 56 (one side), the
second upstanding annular wall 50 (the opposite side)
and the cover 30 (top). All of these "walls" are
joined together to receive and hold soil laden liquid
from the pump chamber....

But that last use of "walls" to convert "the cover 30 (top)" into
the "third wall" is no better than a linguistic sleight of hand.
It flies directly in the face of Whirlpool's own specification
(col. 4, ll. 4-9)(emphasis added):

As shown in FIG. 2, the soil separator 20 further
includes <u>an annular cover 30 which is disposed over and
secured to soil container wall 56</u> by screws 31. When
in place, cover 30 and soil container wall 56 combine
to form a low-pressure water seal, preventing leakage
of water therebetween.

And as will next be shown, it is likewise at war with the portion

of Whirlpool's specification (col. 5, ll. 47-49) that the first
sentence in its above-quoted Mem. 16 paraphrases:

> Soil container chamber 54 is generally defined by lower
> housing wall 49, soil container wall 56, second
> upstanding annular wall 50 and cover 30.

To begin with a nonissue, the "first wall" referred to in
claim 1 is indisputably separate from the "soil container
chamber." Next, the claim, the specification language and the
drawings all confirm that the "second wall" is what is uniformly
identified by the number 50 (described at col. 4, l. 20 as
"upstanding wall 50," and at col. 5, ll. 29-30 and l. 33 and ll.
48-49, and col. 6, ll. 50-51 as "second upstanding annular wall
50"). Only one other "wall"--necessarily the "third wall"--is
referred to, and that is "soil container wall 56."

All that being true, there is no way that Whirlpool can
legitimately characterize "annular cover 30" as a "wall" (either
as part of the third wall or otherwise). That cover is listed
separately at col. 5, l. 49 as one of the components that
"generally define[ ]" the soil container chamber, and col. 4, ll.
5-6 describe that cover as "disposed over and secured to" the
third wall--totally inconsistent with the contention that the
cover can be <u>part of</u> the third wall.

In short, Maytag is right and Whirlpool is wrong. Because

15

the '433 Patent's specification expressly distinguishes between what it labels "walls" and the "cover" of the soil container, the third wall does not include the cover. All other terms in the claim element will be given their plain and ordinary meaning.

"Filter Means" in Claim 1[20]

Next the parties dispute the meaning of this highlighted phrase in claim 1:[21]

> filter means <u>disposed in said third wall</u> for filtering soil particles from said soil-laden portion of said wash liquid.

---

[20] Both parties agree that the discussion that follows in the text also covers two other claim elements:

> 1. Claim 10 in the '433 Patent (W. Mem. 20, M. Mem. 22 n. 13):

> filter means in said soil container for filtering said soil-laden water of non-settling soil particles, maintaining said non-floating and non-settling particles with said soil container chamber, and emitting cleansed liquid.

> 2. Claim 16 in the '433 Patent (W. Mem. 23, M. Mem. 24 n. 15):

> filter means disposed in said soil container for filtering non-settling soils from said soil laden portions, and providing a cleansed liquid.

[21] M. Mem. 18 says that the cited language cannot mean "'on' or 'next to' or 'above' the third wall," in response to the oblique statement at W. Mem. 17 that "the filter means forms a part of the third wall wherein the wash liquid can pass out of the soil container through the filter means."

That language is in means-plus-function form[22] and relates to

this language in the specification (col. 5, ll. 58-60):

> Fine mesh filter segments 32 in cover 30 permit flow of
> cleansed wash liquid to return to dishwasher space 14
> for recirculation.

That last-quoted sentence identifies the "filter means" as

the combination of the filter segments and the cover.  Hence the

"filter means" is "disposed in said third wall" by way of the

filter-segments-plus-cover combination.  Though it must be said

that this reading involves an awkward and unusual use of the

phraseology "disposed in" (something that would ordinarily be

expected to refer to physical placement "in" or "within" the

third wall), this Court cannot punish Whirlpool's patent writer

for poor drafting by disregarding what is actually disclosed.[23]

Instead it reads the language (strained though this may seem) as

calling for the filter means "disposed" (that is, positioned) in

---

[22]  While the function of "filtering soil particles" is
obvious, the only potential structure cited is the term "filter."
That amorphously generic term is not sufficiently indicative of
structure to avoid the application of Paragraph 6.

[23]  It is worth observing that claims 10 and 16 refer to
placement of the filter means "in said soil container" (see
n. 20)--a less problematic usage, given the fact (discussed in
the prior section) that the cover is part of the structure that
defines the soil container chamber (see col. 5, ll. 47-49, quoted
earlier).

17

the third wall only in the sense that the cover is "disposed over and secured to" the third wall (col. 4, ll. 5-6) as discussed in the preceding section. Maytag loses this argument.

"Means for Returning" in Claim 1[24]

It is also agreed by the parties that Paragraph 6 controls this language:

> means for returning cleansed liquid to said pump chamber to be circulated with additional wash liquid delivered thereto when said circulation pump is operated in a wash mode.

But by its very terms the "means" referred to in this element pertains only to the function of "returning cleansed liquid to said pump chamber."

M. Mem. 19 seeks to limit all of the language in that claim element to what Maytag characterizes as its corresponding

---

[24] Both sides agree that the following text discussion also covers two other elements (W. Mem. 23, M. Mem. 24 n. 15):

1. claim 10 in the '433 Patent:

means for returning the cleansed liquid to said pump chamber to be discharged with additional wash liquid delivered thereto.

2. claim 16 in the '433 Patent:

means for returning said cleansed liquid to said pump chamber to be discharged with additional wash liquid delivered thereto.

structure.  But the authority cited by Maytag to support that

notion, <u>Micro Chem., Inc. v. Great Plains Chem. Co.</u>, 194 F.3d

1250, 1258 (Fed. Cir. 1999), actually cuts the other way by

earlier reconfirming that Paragraph 6 is invoked when "[t]he term

'means' appears in a claim element <u>in association with</u> a

function...." (<u>id</u>. at 1257, emphasis added).  In this case the

stated means and its related function are "means for returning

cleansed liquid to said pump chamber."  Though the words in the

claim element do not stop there, the additional language is

merely descriptive of what takes place after the cleansed liquid

has left the "means" referred to in this claim element.

In that respect it is important to recognize the distinction

between two types of liquid described in the specification:

"cleansed" (that is, filtered) wash liquid and the generic term

"wash liquid" that describes all liquid in the washer (contrast,

e.g., col. 6, l. 31 with col. 6, l. 8).  When the "cleansed

liquid" later mixes with liquid that has fallen into the basin

from the spraying of dishware ("additional wash liquid"), the

claim language is careful to distinguish between the two.[25]

---

[25] According to the specification, the "dishwasher
functions as a continuous fluid circuit" during the wash mode
(col. 5, ll. 66-67), so that "cleansed wash liquid...is returned
to circulation ...to be continuously recirculated along with wash

That distinction exposes the basic flaw in the M. Mem. 19

argument that coarse particle grate 21, soft soil chopper 70 and

grate 83 are all corresponding structure. Those elements relate

to straining, chopping and sizing particles from the <u>uncleansed</u>

<u>liquid</u>. As W. Mem. 18 accurately points out:

> [S]ince the cleansed liquid has just passed through a
> fine mesh filter, there are no large particles in the
> cleansed liquid which would require the additional
> function provided by the coarse particle grate, and
> hence the coarse particle grate is not necessary for
> the function of "returning cleansed liquid to the pump
> chamber." Also,...soft soil chopper 70 and grate 83 in
> the flow path of the returning cleansed liquid and
> recirculating wash liquid [are] associated with the
> function of chopping and sizing of particles to reduce
> the size of particles being admitted to the circulation
> pump,...a function separate and additional to the
> claimed function of "returning cleansed liquid to the
> pump chamber."

Significantly, no "means" is then referred to in any other

element of claim 1 that carries out that "separate and

additional" function.[26] In short, that other function is simply

not part of Whirlpool's claimed advance in the art. This Court

therefore determines that the structure corresponding to the

---

liquid..." (col. 7, 11. 9-12).

[26] Not only does W. Resp. 17 freely admit that claim 1 does
not include the functions performed by coarse particle grate 21,
soft soil chopper 70 and grate 83, but that admission also covers
claims 10 and 16. And no other claim in the '433 Patent could
even arguably encompass that structure.

claim element now at issue comprises only floor 11, sealing ring 86, retainer ring 88, base plate 65 and lower housing wall 49.

## "Means For Draining" in Claim 1

Claim 1 also includes this element:

> means for draining accumulated soil from said soil container means when said circulation pump is operated in a drain mode.

This element too is governed by Paragraph 6. As such, its corresponding structure described in the specification comprises drain port 58, ball check valve 60, drain impeller 76 and drain port 78.[27]

## "Means...for Collecting" in Claim 10

One other element in claim 10 is:

> means in said soil container for collecting non-floating soil material from said soil-laden portion of the wash liquid.

It is agreed that this is a means-plus-function element and that lower housing wall 49, soil container wall 56 and second upstanding annular wall 50 provide the structure corresponding to the stated function.

Where the parties part company is that W. Mem. 20 suggests that the "claim element should be interpreted as a lower wall

---

[27] Whirlpool voices no quarrel with this Maytag reading in either of its memoranda.

portion of a soil container which will collect the soils, whether

that wall portion is horizontal, vertical or angled

therebetween." But that amounts to an inappropriate shift into

the future inquiry whether a soil container wall <u>not</u> depicted in

the specification (a non-angled wall) may be an "equivalent"

structure. For now the specification, which shows soil container

wall 56 as being angled, controls this claim construction phase.

<u>"Means Defining a Soil Container" in Claim 16</u>

Despite its similarity to the just-discussed claim 10

element, the parties dispute whether Paragraph 6 applies to this

claim 16 language:

> means defining a soil container for collecting non-
> floating particles from the wash liquid to provide a
> cleansed liquid.

In an effort to overcome the presumption that the element is in

means-plus-function form, W. Mem. 21 says:

> The claimed function of..."collecting non-floating
> particles"....is performed entirely by the recited
> structure "soil container" since there is no aspect of
> the claimed function which is not accomplished by [that
> structure].

But while it is surely true that something like a

"container" must collect those soil particles, that

extraordinarily amorphous generic term scarcely defines a

structure in the sense required to avoid the application of

22

Paragraph 6. There is an almost infinite variety of types of containers, some obviously better than others at performing the claimed function. In fact, Whirlpool's own admission in connection with the just-discussed claim 10 element that "means in said soil container" (W. Mem. 20, emphasis added) "is properly interpreted under §112, ¶6" (id.) strongly implies that "soil container" in the present claim calls for like treatment. So because the term "container" is too generic to escape the reach of Paragraph 6, the quoted element corresponds to the structure recited in the specification and its equivalents.[28]

"Guide Means for Conducting...Wash Liquid" in Claim 16

One of claim 16's many elements is this:

guide means for conducting a portion of wash liquid containing said concentrated soil particles from said pump chamber to said soil container.

Despite Whirlpool's protestations at W. Mem. 22, the term "guide" cannot be viewed as sufficient structure (if it is indeed structure at all) to remove that language from the ambit of Paragraph 6.[29] As Laitram Corp. v. Rexnord Inc., 939 F.2d 1533,

_____

[28] As W. Mem. 21 says, that corresponding structure is "the soil container chamber 54 which is defined by lower housing wall 49, soil container wall 56, annular wall 50 and cover 30."

[29] Nor does the phrase "from said pump chamber to said soil container" add enough to that de minimis description, by

1536 (Fed. Cir. 1991)(emphasis in original) said of a similarly deficient description, "[t]he recited alleged structure tells only what the [claim element] _does_, not what it _is_ structurally."

When the claim is read in terms of the specification as Paragraph 6 directs, it is clear that the corresponding structure comprises annular guide chamber 52, first and second upstanding annular walls 46 and 50, upper edge 47 of first wall 46 and aperture 51 (col. 6, ll. 45-51).[30]  That being so, only one other refinement needs to be looked at next:  W. Mem. 23 (emphasis in original) asks that this Court "expressly find that the claimed functions does not require 'conducting a portion of wash liquid..._from the entire perimeter of the pump chamber_."

On that score the specification says (col. 6, ll. 45-50):

> As the wash liquid swirls upwardly in a clockwise direction, the concentrated soil particles accumulated on the interior of first upstanding annular wall 46

_____

indicating the location of the means, to alter the analysis.

[30]  W. Mem. 22 admits that "guide chamber 52" is "the structure which performs this function" but suggests that it does not have to be annular because, though labeled as such, "there is nothing in the specification which requires such a geometry as necessary to perform the conducting function...."  But Paragraph 6 does not ask a court to evaluate the structure in the specification and to determine, as an engineer might, the effectiveness of any particular configuration.  It rather commands that the claim element be limited to the structure as described in the specification.

> flow over the upper edge 47 with a portion of the wash
> liquid. Wash liquid accumulates in annular guide
> chamber 52....

In light of that language and the depictions of the structure in
the patent's Exhibits, Whirlpool has essentially invited this
Court to repeal the laws of physics--principally but not solely
the principle that water seeks its own level. Because upper edge
47 (like the first wall) is both annular by definition and in the
same horizontal plane throughout, the flow over that edge is also
360° in scope.

## "Means For Backflushing" in Claim 17

Here the parties agree that "means for backflushing said
filter means" in claim 17 is governed by Paragraph 6. And this
is the specification's description of the function and relevant
structure (col. 3, ll. 61-68 and col. 4, ll. 1-3):

> Each wash arm 25 includes...one downwardly directed
> spray nozzle 26 for providing a back-washing action, as
> will become apparent. Each downwardly directed spray
> nozzle 26 has a deflector tab 28 disposed immediately
> adjacent thereto, for providing a dispersed fan-shaped
> spray, as will be fully discussed hereafter. Liquid
> passageway 27 in central hub 23 permits pressurized
> wash liquid to flow to the lower wash arm assembly 22.

W. Mem. 23 argues that the described function relates solely to
"downwardly directed spray nozzle 26," while M. Mem. 24 contends
that it also includes "deflector tab 28, liquid passageway 27 and

lower wash arm 22."

Claim 17 stops short of any reference to those last three
components (which are instead picked up in claim 18, where the
resulting fan-shaped spray is described as providing "improved
backflushing of said filter means"). But the only way in which
the specification describes the backflushing action as being
provided at all is at col. 4, ll. 61-65, which (cross-referencing
Figs. 6 and 7) treats deflector tab 28 and lower wash arm 22 as
playing integral roles in that action. Hence this Court concurs
in Maytag's reading of claim 17 to embrace those components.

That cannot be said of liquid passageway 27, which is simply
one means of supplying water to the lower wash arm assembly.
After all, the entire dishwasher functions as "a continuous fluid
circuit," and the structure corresponding to the claim at issue
certainly does not include all components that serve to circulate
water to the lower wash arm.

To return to the deflector tab issue, this Court is
unpersuaded by the W. Mem. 24 contention that "because of claim
differentiation, the deflector tabs limitation of claim 19 cannot
be read into...claim 17." As <u>IMS Tech., Inc. v. Haas Automation,
Inc.</u>, 2000 WL 306986, at *8 (March 27) teaches, citing <u>Laitram</u>,
939 F.2d at 1538:

> In any event, it is permissible for [two claims] to
> have similar scope after each is correctly construed in
> light of the structures disclosed in the written
> description, because the judicially-created doctrine of
> claim differentiation cannot override the statutory
> mandate of § 112, ¶ 6.[31]

If claims 17 and 19 do effectively merge, it is because of the

way in which Whirlpool itself has limited claim 17 in light of

the specification.

### "Spray Nozzle for Directing" in Claim 18

Claim 18 includes, as part of the "backflushing means" that

is "described in claim 17":

> a wash arm device having a spray nozzle for directing a
> portion of said wash liquid to said filter means for
> clearing said filter means....

Both parties say that claim element 18 should be read in the same

way that this Court has construed the similar language in claim

17 (W. Mem. 23, M. Mem. 24). Although to be sure the quoted

language expressly refers to the spray nozzle and not to the

adjacent deflector tabs, claim 18's back reference to the claim

17 "backflushing means" encompasses those tabs too. So the

parties are taken at their word: Claim 18 adds nothing to (and

subtracts nothing from) claim 17.

---

[31] Whirlpool itself makes that very point immediately
thereafter in the course of telescoping claims 17 and 18 (W. Mem.
23-24, also citing Laitram, 939 F.2d at 1538).

<u>Disputed Claim Elements in the '100 Patent</u>

As indicated at the outset, the '100 Patent assertedly represents an advancement over the '433 Patent: It lessens the volume of water held by the soil container by making it more shallow except for an "accumulator sump" at one end to collect the heavy soil particles. That aside, the '100 Patent at col. 3, ll. 1-3 states that "basic constructional features of the soil separator [from the '433 Patent are] incorporated by reference" into the later patent.

<u>"A Soil/Water Flow Channel" in Claim 4</u>[32]

W. Mem. 24 says that the following claim element "is understood from the plain meaning" of its words, while M. Mem. 25 asserts that the flow channel must be "annular":

> a soil/water flow channel[33] receiving water with entrained soil from adjacent said surrounding wall.

If Whirlpool is right--if the claim language truly conveys a "plain meaning"--then the specification, which refers to "annular

---

[32] This text discussion also covers identical language from the '100 Patent's claim 8 (see W. Mem. 25, M. Mem. 29).

[33] [Footnote by this Court] Although "soil/water flow channel" is used in the claims of the '100 Patent, while "guide chamber" was used in the '433 Patent, the '100 Patent's specification also uses the term "guide chamber."

guide chamber 100," is not needed for guidance.[34]

"Soil/water flow channel" is not defined or even used in the specification. In an effort to support Whirlpool's contention that the phrase has a plain and ordinary meaning, W. Mem. 24 quotes a dictionary definition of "channel" as "a conduit, pipe, duct, gutter, groove or furrow." But that broad set of alternatives would not enlighten a person skilled in the relevant art. Rather such amorphous terms are not "plain" because they can mean whatever a patentee wants them to mean.

Because the claim language itself thus fails to give notice as to just what is claimed, the specification becomes relevant in the construction process. In that respect the primary referent for the term "soil/water flow channel" is "annular guide chamber 100" (col. 4, l. 42). And even though the word "means" is absent from this claim element, it is nonetheless in means-plus-function form (see discussion in <u>Micro Chem.</u>, 194 F.3d at 1257): In this instance "soil/water flow channel" is obviously the means, and its stated function is just as obviously framed as "receiving

---

[34] As <u>Optical Disc Corp. v. Del Mar Avionics</u>, 2000 WL 354753, at *9 (Fed. Cir. April 7) has recently reconfirmed:

Without evidence in the patent specification of an express intent to impart a novel meaning to a claim term, the term takes on its ordinary meaning.

water with entrained soil from adjacent said surrounding wall."
That being so, the exact (and only) structure adverted to in the
specification limits the claim. In short, the "channel" in the
'100 Patent, like the "guide chamber" in the '433 Patent, is
annular.[35]

### "A Soil Accumulator Sump Flow" in Claim 4[36]

Next in dispute is the meaning of the term "sump" in this
claim 4 element:

> a soil accumulator sump flow connected to a second end
> of said screening channel.

Webster's third-listed definition of "sump" is "a pit,
depression, reservoir or tank serving as a drain or receptacle
for liquids to be salvaged or further disposed of." Inserting
that definition into the claim language results in "a pit,
depression, reservoir or tank" to accumulate soil "connected to a
second end of said screening channel."

---

[35] That is hardly surprising, given the earlier-mentioned
fact that the basic structure of the '433 Patent is incorporated
into the '100 Patent.

[36] It is also agreed that the ensuing text discussion also
applies to this highly similar language from claim 8 (see W. Mem.
26, M. Mem. 29):

> a soil accumulator sump flow connected to said outlet end of
> said screening channel.

While that basic construction is generally uncontroverted,[37] M. Mem. 28 oddly suggests that, because Whirlpool's argument to the contrary "finds no support in the specification," the sump can be so small as to collect only a de minimis volume of soil-laden water. That suggestion is rejected, for it really tortures the claim language by effectively vitiating the sump's ability to accumulate soil.

## "Means for Draining Soil" in Claim 4

Claim 4 includes a "means for draining soil from said accumulator sump." With no structure being recited, that element is governed by Paragraph 6. From the specification the corresponding structure comprises pump motor 27, drain impeller 206, drain pump chamber 208, ball check valve 210, ball check valve support 211, conduit 220, soil container drain port 128 and drain port 216 (col. 5, ll. 66-67, col. 6, ll. 1-20).

## Claims 8 and 11

Two elements from claim 8 have already been construed in the

---

[37] M. Mem. 28 views the element as requiring "a recessed area in the screening channel that collects the soil," while W. Mem. 25 similarly says it requires "a depression in the floor of the screening channel through which the screening channel is drained." As the text discussion reflects, however, Maytag then quarrels with the further Whirlpool description that the sump "is sized large enough to permit a non-de minimis amount of soil-laden water to collect therein."

context of like language in claim 4 (see nn. 32 and 36). Apart from those elements, M. Mem. 29 says this in general about claims 8 and 11:

> The construction of the limitations of claim 8 is essentially the same as the construction of similar limitations in claim 4....Properly construed, claim 11, which depends from claim 8, is identical in scope to claim 8, is identical in scope to claim 8, notwithstanding the doctrine of claim differentiation.

Whirlpool interposes no quarrel with those statements--its R. Mem. is totally silent as to both assertions. This Court therefore accepts Maytag's position.

## Conclusion

This completes the construction of the debated claims in Whirlpool's patents as a matter of law. With this Court's earlier opinion having done the same as to Maytag's patents in issue, the case is ready for the second phase of a patent case: a jury determination on the issues of infringement and invalidity. This action is set for a status hearing at 9 a.m. May 5, 2000 to discuss the necessary procedures and timing to that end.

Milton I. Shadur
Senior United States District Judge

Date: April 27, 2000